Let's just wait for his switch to happen. Okay, Mr. Sussman. Mr. Sussman, may it please the Court, and good day, Judge Cabranes, as well. This is an appeal from a grant of summary judgment on a case involving claims of a hostile work environment, as the Court knows. Our position is that there are a multiplicity of hostile acts, which are best outlined perhaps on page 14 of the reply brief most consistently. Also, on JA 1860 through 1886, which is the Statement of Material Facts, you'll note the dispute that we have raised with their statements and our own counterstatement, to which the defendants repeatedly state the evidence cited was not provided, the defendant does not support the statement, which is eliding from my point of view, because, in fact, contemporaneously, my clients repeatedly provided the evidence to the individuals who were allegedly investigating, from the superintendent then to an investigator who didn't meet with one of them, but that's a different story. So I'm not sure what that even meant in the context of a response to a Rule 56.1 counterstatement. My clients presented clear evidence of a multiplicity of events over a period of time, which caused the superintendent, if one carefully reads the record, to be quite concerned about the racial tensions at the facility, which she — I don't know about if it's racial tensions, but the — That was her words. But the employer was concerned about the complaint and launched an investigation and issued a memo that was read out to the staff every morning and changed the procedures for submitting time cards and removed the poems from the workplace and so on. Does that mean that the employer actually responded to the complaints? The response under ALO has to be effectual. The investigation has to be thorough. The remediation has to be, as I say, effectual, which clearly did not happen here. In fact, you say it was read out every day. It was read out once on October 18th. It wasn't read out every day. And that's clearly contested. I'm sorry. I'm sorry. The instruction from the employer was to read it every morning, wasn't it? The supervisors of the employer didn't read it except one time. So that's what the evidence shows, and that's what it was sworn to by my clients. And I don't know where it comes out that it was every day read. In fact, when later in June — I don't know if a lot hinges on that. No, I agree. So if they write a memo and they read it out to the entire staff and say this is how you need to behave going forward, that does seem like they are addressing and taking seriously the complaint. But that's not the standard. The standard is effectualness. And what is demonstrated in this record is that after — Well, the standard has to be it's not negligent. Like, it's possible that you could not be negligent but still not solve everything. Right? They have to have a — they have to address it. Well, in investigation, you say that an investigation was done. I mean, again, the brief goes into this in great detail. The investigation involved first the gentleman who had had a conflict which he recognized, then another individual from Dannemora who was called to investigate who plainly didn't want to be at the facility to investigate and was trying to get other people to do the investigation in his stead. He was cooperating with a captain. The captain was unable to make available five witnesses who even he believed were material to the investigation. They were never interviewed. Mr. Brown was never interviewed. Mr. Rosado was never interviewed, two of the three people whose complaints he allegedly had. He stated under oath that he didn't even have Mr. Brown's complaint. So it's a little bit difficult for me to understand how you get to the conclusion that the investigation was in that light thorough. Well, let me try to focus the question, at least as I've seen it. We're now talking about the attribution, right? We've got — there are three things that the — Yes. — district court found were lacking, and you, alas, have to win on all three. You're right. Okay. The one we're talking about now is the last one — That's right. — in point of logic, which is assuming there was a hostile work environment and assuming it was racial. Is that, since it was basically peer-to-peer, employee-to-employee harassment, is this attributable to the employer? And let me maybe characterize, and you can object to the characterization. What seemed to me here is the question is sort of who's the employer that has to be doing what? Because if you look to the things that Judge Monashi was talking about, which is the warden, right? The warden. The warden did quite a few things here. She sent out the memo. She commissioned an internal investigation, which may have had its own problems, but she at least commissioned that. She took remedial steps for some of the symptoms of the harassment to stop the time card abuse and so on, and she referred it as the policy of the employer is up the chain to somebody higher up to undertake an investigation. If that were the end of it and we were just considering the warden, I'd be pretty satisfied with that. But then what happens when she does kick it upstairs is kind of disgraceful in terms of the quality of the investigation that was conducted, in my view. So what are we to make of that? How are we to make it? The question to me is who counts as the employer?  But what you're saying is very important, because wardens in New York State have no disciplinary authority. This is very important to understand. They have no authority to actually do anything. What they have the authority to do is to refer. There are two different ways to refer. To the OIG, which is part of corrections, and to GOR, which is now called OR, by the way. That's a State agency that the Governor controls. So in this particular instance, the way I understand it is the investigation was referred to both, GOR deferred, and it went to the OIG. So now we're at the OIG, and that's where your characterization, which I don't object to, I think it's true, kicks in. But here's the other part of it, to address again what your colleague on the bench indicates, and I want to address that because I think it's very important. There was one recitation on October 18th, as I understand the date, of a general policy of civility. It did not address the particular incidents that were going on. It, in fact, I think, collided addressing them. But then, I think most significantly, and my clients knew about this, there were two incidents, one in June and one in July. In June, Sergeant Smallwood goes to lineup and reports to lineup that there are these racially offensive things going on in the facility, the Confederate flag issue, the monkey issue, which I'm not going to go into. You know the record, and they're in the record. And what then occurs is that DSS, deputy of security, Noth is his name, N-O-E-T-H, and Barmetra both, and the captain, Froehlich, excuse me, both reprimand Smallwood for bringing this up at a lineup. This is not appropriate to bring this kind of racial stuff up at the lineup. And I think that's, frankly, far more significant in terms of the environment and the tone than what happens in July. And that's why. But how does that affect your clients' terms of employment? My clients are employed in the same facility where that is tolerated. That's what the point is. This is not — and the district judge, I think, is, frankly, totally off base. But he's in the record where Smallwood was asked after the fact if he has any ongoing issues, and he says no. So, like, the person who was — who actually witnessed the problem doesn't think that it's affecting his work environment. Right? Well, but my clients have been directly subjected to a number of things. And to the point about peer, Your Honor, and Judge Lynch, you mentioned peer. And I do want to comment on that. It's not simply peer here. And I understand that there's focus on peer. But it's not simply that. The assignment issues, the failure to repeatedly respect the bid, which in Parker's case twice was overridden internally, but what that demonstrates is a lack of control even by the warden of her own subordinates. Because even after the first time that she says, because she's the one who did this, you can't disrespect the bids. You can't give those bids that she earned to subordinates. Well, the subordinates are not following the policies of the employer. I don't know if that's attributable to the employer, unless the employer is negligent in enforcing the policies. Well, they're not – the policies are not being – the point is they're not being enforced. If you – Well, let me – Go ahead. I thought what I heard you saying principally here in response to my question, and it was a significant fact to me because I hadn't focused on it before, that if – you know, to do something effectual may mean to discipline people who did something inappropriate. Now, the warden, you're telling us, can't do that. That's the – just so it's clear to you, and I want the record to be clear. There's an Office of Labor Relations ad dox. The Office of Labor Relations propounds all disciplinary charges at the agency. If a warden wants discipline, they have to proceed up and wide. She could do something. She could refer it and specifically say it. Of course, the problem here is that we don't know for many of these things who's actually doing them. Exactly right. And the most serious things that were done – it seems to me there's an act of vandalism against the car of Officer Brown. There is the tinkering with the timesheets, which could get them in trouble, and that seems to be a very serious matter. And there are these derogatory poems, which – at least one of which seems to be directed at Brown, and some of which are directed probably at another minority officer. Rosado, right. But we don't know who is actually responsible. But that's why the investigation becomes so important. That's why the investigation becomes important, because I still find it hard to fault the warden, because the warden could have said, oh, people in Albany look at Officer X because he did this and it's bad. She doesn't know that. But she does refer it for an investigation, and the investigator sits half the state away or more and can't be bothered to come down most of the time. What he seems to do is say, you set up a schedule for me, and somebody at the facility, who's probably not that interested in this episode, manages to keep saying, oh, somebody's always missing. And the response is, well, I won't come until I can get everybody all at once. And the result is the investigator never talks to most of the arguable suspects, doesn't even talk, as far as we know at all, to one of the two complainants, may have only spoken to the one he did speak to on the phone. I'm not sure about that. At the call of that complainant, not at his own call. And then says, I'm done. I did a thorough investigation. Now I can't get anywhere with this. I can't substantiate anything. Now, that seems to me to be deeply problematic, and I'll hear what the state has to say about it. But is that the heart of what you're saying, that that's what we should be looking at? Because in the absence of a thorough investigation, you just have sort of toothless reminders to be nice children. And it's more specific. It does say don't do racial discrimination. It doesn't just say be civil in that memo. But there's not really a lot that the warden can accomplish, so that without faulting the warden, you still have the employer that has to take some more serious action. So this is a Title VII. A reasonable jury could think that. That's right. Summary judgment motion number one, as you point out. And number two, this is not a 1983 case in which we sued the warden, just so it's clear. It's a Title VII case in which the employer, which is docs and the State, depending on how one sees those two together, is the, and I say that because of Gore's role in this particularly, they're the employer. So I'm not trying to pin the tail on the warden. I mean, I think the warden. Well, I wasn't saying you were. I'm just pointing out that the warden is taking action, which sort of complicates the way this looks. But you want us to focus on. It's an affection. On something higher up. That's true. Now, the other, I just want to, I know my time, I'm sorry. So OSI is a part of docs. Yes, Your Honor. Okay. Gore's is docs. Yes, Your Honor. So if they refer it to an outside investigator like Gore's, they're not responsible for the conduct of Gore's. No. Gore's didn't investigate. Yeah, I understand. But Gore's didn't investigate because they think it's not racially emotive. That's another issue in the case. So that's a separate. We'll maybe get to that. But OSI is part of docs. So maybe the conduct of OSI is attributable to docs. But if, in fact, the supervisor who has supervisory authority over docs orders the investigation and it's a subordinate employee that we think, you know, could have done more to investigate, is that attributable to the employer? If the employer's action was ordering the investigation? Just to be respectful, let me try to. Did the employer know that the investigation was going to be inadequate, as you say? The way, as Judge Lynch, I think, accurately explained it, is the OIG depended on Frawley and Knuth, who were the two individuals, two of the individuals my client was complaining was suborning the behavior, to arrange the interviews at the facility. That started, Your Honor, in January of 2020. By June, July of 2020, they were still trying to arrange interviews. I mean, I know you have to look carefully through the record. There's a lot of documents about this whole thing going back and forth. If the OSI investigator is not arranging the interviews in the right way, I guess there's two questions. Like, are the actions of the OSI investigator attributable to docs as an institution, which is the employer as the defendant? And the second one is, well, how should they have done the interviews differently than they did? So why don't you answer both of those questions? So is the behavior of the individual investigator who is not, you know, an official in charge of docs the employer's action? Unless you can show that somehow the warden knew that it was going to be an ineffectual investigation or something to that effect. And then two, what do you think that they should have done differently? Okay. So let me start with the first. Again, I just want to make sure it's institutionally clear. OIG is an entity that's not controlled by the warden. OIG is a separate entity within docs that has the responsibility statewide to do these kinds of investigations. So one would assume, I would assume, that they would have the expertise and capacity to do it. Now, it's not just that the investigator screwed up. It's that the investigator was reporting, and again, the memos are in the file, to his superior, to his superior. You have three or four chains of command. And they all, my interpretation, trying to get the investigation finished. Where are you? When are you getting it done? I'll get it done in two weeks. Before he even interviewed anyone in June, he said, it's going to be unfounded unless something else comes up. It's going to be unfounded. He hadn't done anything, literally, if you read the record. So this is not one person. It's the way the entity is. Well, that depends on whether he's right in that assessment. I mean, whether it's, I mean, you know, your argument is that he is, but that doesn't  But my argument is, how do you know, even, from the perspective of understanding No one The way I started this argument Look, sorry. But the way I started the argument was to try to frame their response to the Rule 56.1, which I actually think is important. And the reason it's important was, contrary to that response, contemporaneously in time, my clients reported everything to the superintendent. And when I say everything, I'm talking about the harassing calls, the repeatedly harassing calls, the stalking. All of the behavior was being reported. The palms, nothing was being hidden from the warden, quote, unquote. And from Mr. Ferralli, who was the captain. So for them to respond they didn't know of it is just fatuous. They did know of it. And they had the evidence available to them. The question, as Judge Lynch points out, is who was doing it. Okay? It's not no one's denying it was being done. They saw pictures of the car valve being slashed. No one said it didn't happen. They have photographs of the stalking of my client, Ms. Parker, when she was on post, and individuals are driving by with no reason, taunting her in front of inmates. That's not what's done in correctional facilities. Now, the question was, who was doing it all? And I agree. What's their motive? That's also part of the discussion. What's their motive? Now, my clients are saying, look, this is done selectively not only to us as minorities. It's being done to five other minorities here who are identified on the record. The judge says that's hearsay. That's wrong. That's wrong. As a matter of law, that's wrong. It's no disevidence. And it's what's contributing to the subjective belief that my clients have been racially motivated. It has to be both. I want to use it at this point in time for the demonstration that there was something more going on at the facility, as my clients understood it, than what was simply happening to them. And for that purpose, the fact that it's pervading in the facility is what's relevant. Sorry. You don't get to do like a systematic investigation of an employer, right? Your client has a claim for discrimination against him or herself as an individual. You don't get to just sort of say the employer has general bad practices. And the district court here says this is hearsay, and it also doesn't have a connection to these particular people.  Well, I disagree. I've taken more time than I'm going to have to. Okay. Well, can I ask about the other issues again? Sure. So we're talking about you acknowledge that the motivation matters. So here, the people who are ostensibly engaging in harassment explain their motivation because they write the word racked. And in fact, your clients testified. They think we're disloyal because we testified against officers in earlier proceedings. That was regarding one. If, in fact, their motivation is they're perceived to be disloyal, maybe that's bad. But it is not a protected status, right? It is not based on their race. That was part of what was going on. Rat, also calling bitch, also calling her various other names. That was – It's not just bitch. It's rat bitch, right? So the word rat is still there, right? So the idea – No, no. The harassment is because of the perceived disloyalty as opposed to a racial status is also just evident on the face of the – But that's why the pervasiveness at the facility informs the analysis. That's what a hostile work environment is. It's not just what was directed at me. That's like a shell game to say my clients are being harassed because they're perceived to be disloyal. So there's harassment against them. But I can show that other people suffer racial comments, and so therefore you should say that there's something racial going on with my clients. You have to show that the harassment was not just severe enough to alter your clients' terms of employment, but also that it was based on their race as opposed to something like perceived disloyalty. And when my clients were assigned as they were, disparately, and their bids were disrespected repeatedly by supervisors, those supervisors never said we're doing this because you're a rat or a bitch. That was never their explanation for it. Okay? So you're right – Their explanation was not that it's based on some other status. The explanation was that you are resource officers who can be assigned – And they weren't. And these assignments were not out of – They were bid offices. They were bid offices. They were not resource offices. The explanation was that they're supposed to – But ultimately they get permanent posts that they requested, right? Later in time they got another permanent post. At that point in time they had posts which, as I mentioned earlier, the superintendent herself said had to have been respected and weren't respected.  Can I – I mean, are there other employees at DOCS who testified against fellow officers of a different – who were a different race, who were not called rats? There's no evidence in the record about any treatment of any other officers in that category. So I can't – I can't, on the record, answer your question. But the district court says, well, look at this evidence. It's because of their perceived disloyalty. It's not because of their race. And you don't – and you can't show that, you know, they go after people for perceived disloyalty only when they're of a particular race. I mean, it's not a prime of nature showing of discrimination. But I'm responding to that, that that may be true of some of the events, but it's clearly not true of other events that are part of the pattern. So I'm not – What are the other events? Well, I believe there are – So if you discount everything about being a rat, what's the thing that shows it's clearly racial? When you start messing with people's assignments, swap switches, which occurred between Noble and Brown, overtime, which occurred with regard to Brown and Parker. How do I know that that's racial? Because of selectivity. It's not – it's against the – Arlington Heights tells us that we can analyze race discrimination through deviations from substantive principles and procedural requirements. That's basic – as I understand it, basic – And that's what we have here. The idea is that one of the defendants did not get assignments that were out of the norm. Another defendant did get maybe more hospital assignments, but it was because of the timing of the shifts and whatever. So the district court has before him – Disputes. Well, I have no reason to believe that it's singling them out, let alone because of their race. I don't see why – Well, the district court – that's about a different issue. That's about the issue of disadvantageous assignments. And with regard to Parker, the evidence was clear that she had significantly more such assignments than anyone else had. And there was no explanation for that. I'm speaking about a different issue. When they had specific bid assignments, the bid assignments for both of them were dishonored. And when there was conflict between Firester and Brown, and Firester wrote Brown up in February of 2020, he wrote him up allegedly because he was disrespectful when he questioned why he was being assigned differently than inferior in terms of service, white individuals. Excuse me. That's when he came in and started yelling at the supervisor that he's not getting the assignment he wanted. He didn't yell. Just hold on. The supervisor says that's not the way you address this. But then, of course, he writes up the counseling memo, and then there's no – it was dismissed, right? There's no ad for – like, it doesn't alter his employment, right? Was any action taken against him besides just writing the memo saying you shouldn't have done that? A hostile work environment does not depend on tangible detriment. That's not the law. The law does not say that. It's a hostile work environment. It's not severe or pervasive enough to alter the terms of their employment. I agree. But terms of the employment are being altered because each day they're going to work, they are being given, at least Brown in that specific case, a bid, which is an inferior bid to a less senior Caucasian officer. And there is no reason being given for that. And Brown comes in and he says to Firester, what is going on here? And the argument, I don't – I disagree that Brown started yelling at him, but regardless of what happened. It's a fact dispute, right? It's a fact dispute. Your client who says he didn't shout, it was Firester who started all the yelling. And Firester says the opposite, and that's what we have juries for. And when he was challenged – Why is that a material fact? Because he – If the supervisor thinks he's being disrespectful by coming into his office and protesting his assignments, does it – why is it probative of whether there is racial discrimination when somebody was yelling or was doing something else that the supervisor thought was disrespectful? The underlying issue that was being raised by Brown was why he was being disfavored in the assignment to a less senior Caucasian officer. And that's what Brown said. Could Brown come in and say you are giving me less favorable assignments because of my race? Yes. That's the point. And he did. And Firester went crazy, and Firester started, you know, from our point of view, responding in this highly negative way because he was being challenged. Anyway, I do think there are factual issues that a jury is supposed to resolve on all these three points. I appreciate your time. Okay. Thank you, Mr. Sussman. Mr. Sussman, let's hear from the State. Mr. Acosa. May it please the Court, Kwame Acosa for the State defendants. I want to begin with the failure – the issue about imputing liability based on a failure to control the working conditions. The undisputed facts really show here that docs took these matters very seriously. And I want to focus on the totality of factors. My friend focuses on one particular investigation, but there are several other things to take into account. So the superintendent or the warden, upon hearing about these complaints in October of 2019, immediately ordered the three investigations that were discussed. First, the internal investigation by Captain Frawley, a high-ranking officer. Second, the OSI investigation and the Goer investigation. So this was an immediate attempt at remediating the issue. Frawley investigated by interviewing every individual who was accused of wrongdoing, including the plaintiffs who were also interviewed. But he was unable to find evidence that a particular individual was involved in the time card. Every issue that was brought to his attention, time card tampering, blank transfer forms, poems, prank calls, damage to the tire. So all those issues were brought before Captain Frawley. OSI takes the investigation in November of 2019. OSI interviews Brown and Parker. My friend says that they were not interviewed. That's incorrect. They were interviewed by OSI. And then OSI did not just do interviews. They did a handwriting comparison to try to determine who wrote rat on Parker's time card slot. They took into – they looked into the stalking allegations. But they could not find any substantive evidence to substantiate these claims. Then Goer independently made a determination that there was no racial discrimination. And I want to also talk about the remedial measures that were taken in addition to this, because docs didn't just sit around and wait for the outcome of these investigations. Plaintiffs don't dispute that all lieutenants and sergeants read aloud and discussed with staff this memorandum that was discussed, admonishing correction officers that harassment will not be tolerated. And then plaintiffs further do not dispute that their sergeant, for their tour where the alleged wrongdoing was taking place, ordered all officers to stop tampering with the time cards and to stop circulating the poems at issue. And they also don't dispute the security measures that were taken into account to make sure time card tampering stopped. And I just want to focus on what these remedial measures did. They worked. It's undisputed that after these investigation remedial measures, the poems stopped circulating in the facility. Parker no longer had issues with her time cards. That's her testimony. Brown did not report receiving prank calls or blank transfer forms. Those allegations occurred in late September, early October, well before the investigation and the remedial measures took place. There was no allegation that those actions took place afterwards. There was no allegation that stalking took place or vandalism took place after the investigations took place. So I would just point out that the remedial measures show that all three of the important factors in Summa v. Hofstra University have been met here. This was immediate. It was timely and appropriate. And so there might be questions about the OSI investigation. So why did it take so long? Why were they not able to identify certain individuals for interviews? That's not the analysis, right? The analysis is whether or not over the totality of the circumstances, was this remedial, was this negligent? And the answer is no. So you're suggesting that actually even the internal investigation was an appropriate response by the employer. Let's say I thought that the OSI investigation mattered. Is the conduct of the OSI investigation attributable to DOCS? We've not disputed that. The OSI investigation is part of the DOCS investigation, so the OSI investigation is part of what was done here to remediate the — Okay. So was OSI negligent in relying on the supervisors at the facility to arrange interviews and those kinds of things? Your Honor, there's nothing in the record that's showing that they could have done it themselves. I don't understand how sort of you can reach the conclusion necessarily that the interviews could have been arranged in some more effective way. That's just a sort of symptom, isn't it? I mean, the point is the interviews never happened. The point isn't, you know, you can look deeper into why it never happened. It seems to me, as someone who's conducted investigations in his lifetime, that if I want to find out what's going on in a place, I should interview the people who are responsible, and I shouldn't give up because somebody says, oh, well, we can't get all those people together on the day that you'd like to come down and do it. That does not seem to me like responsible behavior. Responsible behavior is to either make them do it or to come down twice and make sure you interview the people who need interviewing, right? We ought to just be clear that they did interview correction officers that were accused of wrongdoing. They interviewed Correction Officer Grady, who was accused of spreading the poems, and the same with Correction Officer Wood, and they also interviewed Sergeant Bays, who had information about potential wrongdoing. And so these interviews didn't yield information about them. So those are the three – there were three interviews that were conducted of, for want of a better word, what one might call suspects? Suspects and individuals who have information that's relevant to the investigation. Well, people – okay, so people who might – persons of interest. Persons of interest, yes. Is what the police department calls them. Yes. Three persons of interest. Well, there was also interviews with the superintendent, Captain Frawley. There were opportunities to discuss the case and also interviews with Parker and Brown. So this was not just – it's important to take into account all of these. It's not a disputed fact that there were – about whether there were interviews with Parker and Brown? It's not a disputed fact. It's on – I'm trying to bring up the record here. It's not disputed that OSI conducted – interviewed both of them in November of 2019. That is on, I believe – I don't have that record site here for me. But it is not disputed that they interviewed them. This is something that was discussed in our brief and also discussed in the district court opinion. So this is not a dispute. There might be a – there's no – well, I think what my friend is saying is that the investigator who ended the investigation didn't do the interview, but there were two investigators in OSI. Oh, okay. Okay, and then there's this question about whether it's racially motivated. And so I pointed out that saying somebody is a rat does indicate that your motivation is perceived as loyalty and not race. And so I asked Mr. Sussman what is based on race, and he says the bid assignments. So are the bid assignment processes that race-based? No, there's no evidence to support that. And I think it's not disputed here that these individuals had jobs, relief officer, resource officer. In those roles, they had the – they were obligated to do mandatory overtime, for example. So Brown complained about mandatory overtime during the COVID-19 pandemic in the flu unit and the outside hospital. And so it was just – it was very clear and not disputed in the record that the correctional facility needed staff to work those positions during an unprecedented issue. So – and then on top of that, the resource officer position, they don't have set positions. And so they're put into places in the facility where they're needed. And that's not disputed either. So it's not a change in the circumstances of their employment. Are they in fact getting bids that are less advantageous than they requested? Is that out of the ordinary? No, no, Your Honor. We would dispute – we wouldn't dispute that in terms of a factual issue. But there's no evidence to support the idea that some bids – some assignments are inherently, objectively worse than other assignments. These are individuals who work in a correctional facility and have important duties to perform. What about their bids not being honored? Is that out of the ordinary? It is – it is not out of the ordinary if there's a need in the facility for someone to work a particular shift. And that is part of their job description. That's part of their job description. So you're saying it doesn't change the terms of the employment? That's right, Your Honor. It doesn't change – And even if it's – even if it is out of the ordinary, it could be based on any kind of – It doesn't – it doesn't create an inference. Like, is there a comparison with, you know, people of a different race? No, Your Honor. They don't point to any comparator. They don't say that this white colleague, for example, had this many shifts and I had this many shifts. There's nothing like that in the record. And I would just point out, if there's concern about the number of times they were assigned, I mean, we did an analysis in the flu unit, for example. Brown was assigned four times in one year. Parker was assigned 12 times in one year. And by contrast, we found many other officers that were assigned far more often in those units. So then in addition to the idea that it's not based on race or it's speculative as to whether it would be – you also think it doesn't – it's not severe or pervasive enough to alter the terms of employment? That's correct. It's not a tangible employment action to the extent it was done by a supervisor. And with respect to the misconduct by the coworkers, that was also not severe or pervasive enough to change the terms of employment. If they didn't feel – if they, in fact, felt unwelcome in the workplace, would that be a violation of Title VII? No. There's a subjective and objective component, Your Honor. So it would be sufficient, perhaps, for the subjective component. But in terms of the objective component, it determines whether or not a reasonable person would interpret these events to be discriminatory or so severe and pervasive to be based on discriminatory. Well, they're two separate inquiries, right? One inquiry is was there severe and pervasive abuse of people? A separate question is what was that about? Are you contesting that a reasonable jury could find that having your tires slashed, having your time cards repeatedly stolen, in effect, or misplaced in such a way that you could be disciplined because normally you're just supposed to check in and check out, right? And if you're not doing that properly, you're in trouble. So that's a serious sort of thing, it seems to me. Having derogatory poems circulated about you, getting transfer slips placed in your mailbox, which seems to be a pretty clear indication maybe you should go somewhere else. Have I covered them all? We've talked about derogatory poems. You don't think that a reasonable jury could say that's severe and pervasive mistreatment? Well, Your Honor, I would just point out that some of the events you're describing take place over a short period of time. They're very sporadic, and they're actually just one day events. They can't be sporadic and taking place over a short period of time. Sporadic would be it happened once in 2019 and again in 2022 and something like that. It's severe and pervasive is what we're looking for. All that stuff happens over a short period of time. That sounds like a pretty serious situation as of that period of time. Now, maybe there's another argument that it got corrected. That's a separate thing. I'm trying to take them one at a time. You're saying that a reasonable jury could not conclude that the pattern that I've described, especially taking place over a relatively concentrated period of time, but not like all on one day. These are separate incidents over a period of time. So it's both extensive to some degree. It's not all like one thing happened once or one guy did several bad things all at once. It's a bunch of different things that happen, not randomly dispersed over a very wide period of time. That's kind of what I'm thinking a reasonable jury could say. This would make a reasonable person feel unwelcome. There's no argument from our side that the conduct complained of was offensive and it was inappropriate in the facility. But I think what we argue in our brief is that it wasn't severe or pervasive enough to alter the current condition. That's what the jury court thought, right? Yes. As a matter of law, no reasonable jury could think that that was severe and pervasive. I understand that position. Okay, second question, and this seems to me to be the toughest one in a way. Is this based on race? Now, let's not lump these two people quite so fast. Brown is considered a snitch kind of because he was a snitch. I wouldn't put a negative connotation on that from my standpoint. He refused to go along with, or maybe he did go along with and then turn state's evidence, in effect, at an investigation at another facility. That actually happened, right? Yes, Your Honor. And so there are reasons why people might be resentful, corrections officers might be resentful of him. There are bad reasons, but they're not necessarily racial. Officer Parker, is there any such similar history for her? Yes, Your Honor. There was a disciplinary hearing involving a bus pass for an inmate that she testified in, and she testified at a 361. You testified on behalf of the inmate. On behalf of the inmate who was accused of wrongdoing. And so that was, and in her words, she was being bullied for that. She even says that her coworkers thought that she was not backing the blue. That's right. That was the motivation that she cited for the misconduct. And there's also something where there was a picture of her with someone who was an inmate, not at this institution, I gather, but someone who was in prison. Right. And I guess one of the things that occurs to me is are we closing our eyes to reality to think that in a prison environment in which prisoners are disproportionately minority, that minority officers would be more likely to be accused of being disloyal or of having connections to other people who are incarcerated? And is that something that we should take some note of? Well, Your Honor, it wouldn't be enough to say that the misconduct occurred and I'm a member of a protected category. That's not enough in itself. But it's – we're getting to some more things here, right? Mr. Sussman says there is evidence. Now, I guess there's a question of whether it's only hearsay evidence that there were other racially charged incidents taking place at the same time. We have confederate flag issues. We have monkey issues with respect to events, characterization of people outside the prison environment who are in the news. We have those things happening. We have the fact that at least one of the poems is a parody of sorts of a television program about a minority person who is perceived as out of place. Would that be a fair characterization of – I never watched The Fresh Prince of Bel-Air. So that's kind of what they're suggesting it is, right? And, you know, all of that – a reasonable jury can't consider that – any of that stuff as evidence suggesting that there's something more going on here than there's something racially charged happening here? Well, my response would be is that what matters here is what happened to the plaintiffs. And those allegations that are – you know, there has not been an argument that they actually are admissible. But those other allegations of racial discrimination are just not about the individuals who have been accused of wrongdoing here. They're not about the individuals who – Well, hold on. Wait a moment. I mean, we're talking – what happened – what constitutes the pattern of alleged hostility and hostile environment has to have happened to them. I'll put a little asterisk on that, that if you sort of see nooses being put on the desks of other black – And we don't have that here. We don't have any of that. But that's just an example. If you see something racially discriminatory happening to someone else of your race in the same environment, that could be problematic. But basically the hostile environment has to be happening to them.  But the evidence of what that is about – there is Rule 404B in the Federal Rules of Evidence, right? You can have evidence of prior similar acts or contemporaneous similar acts as evidence of intent. Now, maybe that evidence – if there's only hearsay, that might be a problem as opposed to some actual testimony or affidavit from someone who said I experienced this. But that evidence would be relevant, would it not, to demonstrate intent? I guess my response would be whose intent? Because, for example, we'll just take the anecdote from Sergeant Smallwood, who overheard unidentified officers – these officers are not even named in the record – who made this comment, this offensive comment. It's unclear, you know, how that – the intent behind those unknown individuals could at all be relevant.  So it would have to be the same people who actually were harassing these defendants.  And we don't know who those people are. We don't know who they are. And even then, it has to be something that's attributable to the employer, right? Correct. In fact, even in those hearsay incidents, the employer kind of responds because they ask the person to take off or cover up the Confederate flag thing. Yes. I don't know if that really is a severe thing, having a Confederate flag on your mask, but they even ask him to cover it up, right? Yes. So even if it's a pattern, which I'm not sure it is, it's not – Well, again, we're taking one step at a time, or at least I'm trying to do one step at a time through the three different issues. And my biggest issue – my biggest issues are, first, one has atmospherics that give off a certain whiff, shall we say, of discriminatory motivation. And the question is, is any of that sufficient to let a reasonable jury conclude that the person who slashed Officer Brown's tires would have done the same thing to a white officer who had testified in some proceeding in some other institution? So that's one set of stories. Then the attribution issue has to do with how much weight we place on investigation, how much weight we place on whether this – how effective was this in actually stopping things? It seems to me it did stop a lot of it. Things got better. Is that good enough? Those are the kinds of issues that I'm concerned about here. Can I ask this question? Is there any reason to believe that corrections officers are going to be more likely to accuse minority officers of disloyalty? No, Your Honor. There's nothing – In fact, there are lots of corrections officers who are minorities and are proud to be corrections officers and are loyal to corrections officers, and they're as capable of backing the blue as anybody else. Right, right, Your Honor. And I would just point out – Right, right, right, Your Honor. We can't just make that general inference, can we? No, we can't. And I think there was an opportunity, perhaps, if they had evidence of this, is that they could have found a comparator or some sort of situation where the – or some sort of disparate treatment. In fact, here, they actually did do disloyal things. So it's sort of bizarre to say that they were disloyal.         Well, of course, the natural inference would be it's because of a racial motivation. It's certainly not evident from the record why there would be a racial motivation. And I was – Maybe this is a little bit, you know, silly to think about in detail, but in The Fresh Prince of Bel-Air, the people who belonged in Bel-Air and the person who was out of place there, they were of the same race, right? Even in the telling of the poem, it describes corrections officers who live in the same place. Right. So, like, the idea that that itself is, like, something racial is not an inference any reasonable person could make, right? Yeah. Reading the poem on their face, they're totally facially neutral. Yeah. There's nothing in the poems about race. Nothing at all. In fact, there is stuff in the poems about disloyalty because it talks about ratting out on fellow officers. That's right. So there's nothing there to change what the motivation is. And then on the question about severe or pervasive, right? So some people vandalize the time cards, right? That's the allegation. That's right. Is there any allegation that anybody got in trouble because of the poorly filed time cards? None whatsoever. No one lost his payments or anything. So everybody who was looking at the time cards just treated it as a vandalism, not as something that led to a disciplinary action against the officers with the time cards. And there were white officers who also complained of missing time cards, I would add. That's something Correctional Officer Brown testified to. There's no reason to think that, right? And then so in the poems we talked about, I mean, even if they were based on race, you're circulating poems, right? So like somebody doesn't like you, is that severe enough to change the terms of your employment? Not in terms of Title VII. And the transfer slips that appear in their box, that's just saying we don't like you and don't want you here, right? Right. It's offensive behavior, to be clear, but it doesn't rise to the level of Title VII. It isn't like if I have a job, I would not think that suddenly my job is different and the terms of employment have changed because my fellow employees have said they don't really like me and would prefer that I not be there. That is the inference that can only be drawn from the evidence that's been brought before the jury.  And so then that leaves just the idea that the tires were slashed. Now, I understand that the internal investigation thought that they weren't slashed by fellow officers. That's correct. But I guess that might be a factual dispute. So like so one incident of vandalism, would that be severe enough that it might alter the terms of employment? There was certainly no allegation or evidence to support that it did. I mean, there was no, for example, argument that he was late for work or there was some problem with getting to an assignment or anything like that. So it was just the stem of the tire and then the flat, and that was it. That was the only allegation. And it didn't happen again. So it is a step above the transfer slips. It's not just like the co-workers don't like him, but they actually are willing to – or at least one person is willing to do something aggressive. But that wouldn't indicate to you that the employer has altered, you know, the status of their – No, not at all. And there's no inference that that act was because of race or ethnicity as well. In fact, I think Brown's testimony himself says it was part of a course of bullying related to his testimony in the Federal proceeding. Okay. Thank you. Thank you very much, Mr. Acosta. We'll turn back to Mr. Sussman on rebuttal. I just wanted to go back to the record in the case. Page JA-1559. This is in response to one of your questions, Your Honor, regarding the Firester incident. You asked directly this question. The testimony is, His explanation of the incident of February 25th is false. When I was bumped from my assignment and sent to a post with ill inmates, I questioned why less white senior white officers were being assigned to the bid I should have had. Firester began screaming at me and then turned the situation around and accused me. So you stopped at the tire slashing. But that's not the last event. The tire slashing was not the last event. The Firester incident was the last event. And that's an event by a supervisor. You did it by insubordination, right? I'm sorry? You stopped at the sentence that he turned around and accused me. But what did Firester accuse him of, of insubordination? Of doing what he was doing. Of what? He said of doing what he was doing. That's what the sentence says, which I've written to the record. The point is, he went in. You asked specifically, did he raise the issue of race with Firester? The answer to the question I said earlier was yes, and I wanted to cite to the record where that's in the record. He plainly raised the issue. Firester certainly isn't someone who was retaliating against him, as far as Firester said in his deposition, because he testified previously, Firester claimed not to know anything about it. With regard to the investigation. I guess here's my question. So if somebody, if Firester believes that everybody is assigned based on whatever the internal process is, an employee comes into his office and says, I think that this is all racial discrimination and I'm entitled to other assignments, and Firester is offended by that and says you can't just barge in here and do that kind of thing, does that show that Firester is discriminating on the basis of race? Firester was a supervising officer of DOCS. It would be, my view, it's attributed to DOCS. If Firester berated him with racial epithets or something, then that would be attributable to the employer. It's more. Why does this incident show that the employer was acting on the basis, was discriminating on the basis of race? Because the underlying incident is the assignment, which assignment was being challenged on a racial basis by Mr. Brown, who said, why are less senior Caucasian offices being given assignments preferable to that which I'm being given? Firester didn't say it's not preferable. Firester didn't say anything other than start screaming at him. And my point is, this is the dynamics that they were facing. The gentleman gets up and starts speaking about someone did an investigation, thorough investigation, and the Court asked several times, who was interviewed? Brown's affidavit is very clear on who was interviewed. Again, I think that the question of what's in the record matters. He says explicitly, with respect to Germano, he did not interview me or those Parker and I deemed primarily responsible for harassing us, including P.O. Watch, Captain Frawley, Sergeant Firester, or witnesses we identified, including C.O. Lassiter, Sergeant Rosado, or David Taccarante. Judge Lynch earlier mentioned the nature of the investigation. Counsel got back and said they were interviewed. They were not interviewed by the individuals from OIG who had the responsibility to interview them. Neither Rosado nor Brown were interviewed. Are they interviewed by somebody else from OIG? No. They were not. So you're just you have one accountant opposing counsel to another accountant so we can check the record. We can check the record as to what you're saying. Okay. So Mr. Acosa said that he thinks the difference is that it's the original investigator and not the one who filed the report who did the interview. The original? The original investigator was Mr. Felix Cotto, Your Honor. Felix Cotto, when he, when Mr. Brown saw Felix Cotto, Mr. Brown indicated to Felix Cotto that he knew Felix Cotto, had had a prior association with a number of these officers from the closed Warwick facility. Mr. Cotto acknowledged he had this conflict, and that was the end of his role in the investigation. He didn't interview Mr. Brown. He had an initial meeting in which that meeting, meaning literally contact, in which that exchange occurred. That's not an interview. There was no interview. Moreover, Mr. Germano acknowledged, with regard to the issue of investigation, and I think that it's all bound together. The nature of the investigation is relevant to, well, is there really racial bias going on here or is something else going on here? If you don't even interview the people involved, and it's undisputed in Germano's deposition. There were five people he wanted to interview. He never interviewed. He never got Brown's complaint. He says that under oath. How is he investigating a complaint he never received? Thank you. Thank you very much, Mr. Sussman. The case is submitted. And because that is our last argued case today, we are adjourned.